**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |  |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES GENERAL SERVICES ADMINISTRATION**, <br><br> Defendant. | Case No. 18-cv-377 (CRC) |

## MEMORANDUM OPINION AND ORDER

Few structures in Washington D.C. are more maligned than the J. Edgar Hoover FBI building. Architecture critics pan its brutalist design, D.C. denizens bemoan its uninviting presence on Pennsylvania Avenue, and, most relevant to this case, the FBI itself considers it too small and unsafe to continue to function as the bureau's headquarters. For the better part of a decade, the General Services Administration ("GSA")—the federal agency responsible for acquiring and maintaining government facilities—has been exploring relocation and renovation options. Until last year, one proposal appeared likely to materialize: the FBI would offer the Hoover Building (and cash) to a real estate firm that would, in return, lead the construction of a new headquarters elsewhere in the region. GSA identified three potential building sites and began soliciting proposals from developers. But those efforts came to an abrupt halt in July 2017, and in early 2018, the FBI announced that it planned instead to rebuild its headquarters at the present location.

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") wants an explanation for GSA's about-face. Among other concerns, CREW suspects that President Trump put the kibosh on the swap-relocation plan because he feared that commercial

development at the Hoover Building site might compete with the neighboring Trump International Hotel. To substantiate its suspicions, CREW filed a Freedom of Information Act ("FOIA") request with GSA. It sought records explaining the decision to abort the swap-relocation plan and related communications between GSA brass and other government officials, including the White House. The agency has responded to that request and claims it is now entitled to summary judgment. CREW opposes, objecting to the adequacy of GSA's search and the propriety of its withholdings. For the reasons that follow, the Court largely agrees with CREW and will deny GSA's motion for summary judgment.

I. **Background**

For the last several years, GSA has been on the hunt for a new FBI headquarters—one that could accommodate a consolidation of the FBI workforce and provide beefed-up security. Compl. ¶ 6. After publicizing a proposal that would involve the FBI swapping its current home, the J. Edgar Hoover building on Pennsylvania Avenue, in exchange for a newly built one in either Maryland or Virginia, id., GSA announced on July 11, 2017 that it was cancelling the "new FBI headquarters consolidation project," id. ¶ 7 (quoting GSA Statement on FBI Headquarters, July 11, 2017[1]). Questions immediately arose as to why GSA had abandoned the project. Id. ¶ 8; see, e.g., Jonathan O'Connell, Robert McCartney & Jenna Portnoy, *Fallout from FBI Headquarters Decision Leaves Losers All Around*, Wash. Post, July 11, 2017.[2]

---

[1] *Available at* https://www.gsa.gov/node/87972.

[2] *Available at* https://www.washingtonpost.com/business/economy/fallout-from-fbi-headquarters-decision-leaves-losers-all-around/2017/07/11/7571b362-664a-11e7-8eb5-cbccc2e7bfbf_story.html?utm_term=.335ab28241e9.

2

The very next day, on July 12, 2017, CREW joined the chorus of inquisitors. It submitted a FOIA request to GSA seeking the following six categories of records:

- "copies of all records from January 20, 2017 to the present explaining the decision of GSA, announced on July 11, 2017, to cancel the procurement for the new FBI headquarters consolidation project. This request includes, but is not limited to, records from GSA Public Buildings Service, GSA Office of the Administrator, and the National Capital Region";

- "copies of communications between GSA Regional Commissioner Mary Gibert and GSA Administrator Tim Horne from January 20, 2017 to the present concerning GSA's decision to cancel the procurement for the new FBI headquarters consolidation project";

- "copies of email communications between either Mary Gibert and Tim Horne and any individual at the eop.gov domain from January 20, 2017 to the present concerning GSA's decision to cancel the procurement for the new FBI headquarters consolidation project";

- "copies of communications between FBI officials and GSA concerning GSA's decision to cancel the procurement for the new FBI headquarters consolidation project";

- "copies of communications between the Office of Management and Budget and GSA concerning GSA's decision to cancel the procurement for the new FBI headquarters consolidation project"; and

- "copies of records sufficient to show the amount of federal funds expended to evaluate the final three locations designated by GSA as possible sites for the new FBI headquarters in Fairfax, Virginia and Prince George's County, Maryland."

CREW's FOIA Request, ECF No. 16-2, Ex. A.

GSA determined that GSA's Office of the Chief Information Officer ("OCIO") was the office most likely to have records responsive to CREW's first five requests, Declaration of Travis Lewis ("Lewis Decl."), ECF No. 16-2 ¶ 6, and that its Public Building Service ("PBS") would have records responsive to CREW's sixth request, id. ¶ 11. In March 2018, GSA notified CREW that it had found zero records responsive to its first five requests and one responsive to its sixth. Id., Ex. B. After realizing that it inadvertently searched for "Mary Gilbert" rather than

"Mary Gibert" pursuant to CREW's second request, OCIO performed a follow-up search with the correct name and produced to CREW an additional 28 responsive pages in July 2018.  Id. ¶¶ 14-15; id. at Ex. C.  GSA also withheld records that it determined were subject to the deliberative process privilege under FOIA Exemption 5 and redacted agency employees' signatures and cellphone numbers under FOIA Exemption 6.  Id. ¶ 19; Ex. D.

GSA believes it has fulfilled its FOIA obligations and has moved for summary judgment, Def's Mot. Summ. J., ECF No. 16, which CREW opposes, Pl's Opp. ECF No. 17.  The Court held a hearing on December 12, 2018, and the motion is now ripe for the Court's resolution.

## II. Legal Standards

FOIA cases are typically resolved on summary judgment.  See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment is appropriately granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under FOIA, an agency must adequately search for any responsive records.  Rodriguez v. U.S. Dep't of Def., 236 F. Supp. 3d 26, 34 (D.D.C. 2017).  When a FOIA requester challenges the adequacy of an agency's search, the agency must show "beyond material doubt that its search was reasonably calculated to uncover all relevant documents."  Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011) (quoting Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999)) (internal quotation omitted).  In reviewing an agency's search, courts examine the methods, not the fruits, of the search.  Rodriguez, 236 F. Supp. 3d at 34.  An agency "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).

Agencies can make this showing through affidavits that detail "what records were searched, by whom, and through what process." Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 552 (D.C. Cir. 1994). Agency affidavits are "accorded a presumption of good faith" and "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation omitted).

In addition to demonstrating that it conducted an adequate search, the agency must also justify any withholdings it has made pursuant to a FOIA exemption. See, e.g., Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009). An agency may justify its withholdings through sufficiently detailed affidavits. See, e.g., id. But because the primary purpose of FOIA is disclosure, courts construe exemptions narrowly. See, e.g., DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

### III. Analysis

CREW disputes the adequacy of GSA's search and its justification for withholding records. The Court addresses each issue in the order CREW raises them.

#### A. Facial Implausibility

CREW's first argument hinges more on intuition than law. It asserts that GSA's claim to have found only 28 pages of records responsive to CREW's first five requests "defies credibility." Pl's Opp. at 16. Given that GSA and the FBI have "engaged in over a decade of planning and discussions concerning a new FBI headquarters," CREW says the agency's paltry response is "facially and patently unreasonable." Id.

While the Court admits some surprise at the paucity of records, the reasonableness of an agency's search "is generally determined by evaluating the methods used to carry out the search,

5

not by examining the search results." Rodriguez, 236 F. Supp. 3d at 34; see Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003) (search adequacy determined "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search"). And though it is true that in some cases "a court may place significant weight on the fact that a records search failed to turn up a *particular* document," Iturralde, 315 F.3d at 315 (emphasis added), CREW points to no such document in this case.

CREW does highlight a statement in a GSA Inspector General ("IG") report on the FBI headquarters project that the IG "reviewed over 50,000 GSA documents and emails concerning the FBI headquarters consolidation project." Pl's Opp. at 23 (quoting *Review of GSA's Revised Plan for the Federal Bureau of Investigation Headquarters Consolidation Project*[3] ("IG Report") at 1). CREW queries: how can it be that GSA found only 28 pages of responsive records when the IG Report found at least 50,000 documents pertaining to the consolidation project? But remember, CREW's FOIA request was not for *all* records "concerning the FBI headquarters consolidation project"—what the IG Report surveyed—but instead for records from January 20, 2017 onward concerning the decision to "*cancel* the procurement for the new FBI headquarters consolidation project." CREW's FOIA Request, ECF No. 16-2, Ex. A (emphasis added). That means many records that the IG Report reviewed would reasonably be excluded from CREW's request—because they either predated January 20, 2017, or concerned the consolidation project, but not the decision to call it off. Nor would CREW's request capture records concerning GSA's subsequent decision to renovate the Hoover Building rather than relocate, as the agency has explained. Second Declaration of Travis Lewis ("2d Lewis Decl.") ¶ 4 (stating that agency's

---

[3] *Available at* https://www.gsaig.gov/content/review-gsa's-revised-plan-federal-bureau-investigation-headquarters-consolidation-project.

6

cancellation decision was "a wholly separate matter from GSA's decision to renovate the current FBI headquarters").

Without some hard evidence that the agency's search unreasonably missed a particular document, CREW's "facially and patently unreasonable" argument amounts to "speculation that as yet uncovered documents may exist." SafeCard Servs., 926 F.2d at 1201. And speculation alone does not provide an adequate basis to order a subsequent search.[4]

B. Adequacy of the Search

CREW next argues that GSA has not met its burden to show "beyond material doubt that its search was reasonably calculated to uncover all relevant documents." Ancient Coin Collectors Guild, 641 F.3d 504, 514 (D.C. Cir. 2011) (quotation omitted). It takes particular aim at the declaration the agency provided in support of its summary judgment motion. CREW argues the agency failed to specify the time frame used in its search, failed to search certain locations and for non-electronic documents, and failed to use sufficiently inclusive search terms. Pl's Opp. 18-22. The Court takes these in turn.

1. *Time Frame*

CREW faults the declaration for failing to "identify the date or dates of the search the agency conducted." Pl's Opp. at 18. Without knowing "the date on which the agency conduct[ed] its search," CREW says the "Court has no way to assess whether the agency employed a reasonable time-period in searching for responsive records." Id.

---

[4] To be sure, CREW later in its brief does home in on some particular documents that a reasonable GSA search ought to have revealed. But CREW highlights those documents in support of its more detailed adequacy-of-the-search argument, and so the Court will address them in its analysis of that claim.

While GSA's first declaration did not make clear the date on which the agency conducted the search, it did provide the time frame for the search (January 20, 2017 to February 23, 2018), Lewis Decl. ¶ 14, and clarified in its second declaration that it conducted the search on February 23, 2018, 2d Lewis Decl. ¶ 5. Starting the search at January 20, 2017 is obviously reasonable, since that is what CREW's FOIA request explicitly requested. And CREW has already conceded in its opposition that the date on which the search is conducted is a reasonable end-date for a FOIA request. Pl's Opp. at 18 (citing Pub. Citizen v. Dep't of State, 276 F.3d 634, 644 (D.C. Cir. 2002) (holding that "date-of-search cut-off" was more reasonable since it might return more responsive records)). The agency's supplemental declaration therefore takes care of CREW's date-of-search complaint.

2. *Locations searched*

CREW next criticizes GSA's explanation of *where* it searched for the requested records. Specifically, though GSA says it sent the first five requests to OCIO "because OCIO . . . has access to all of the agency's electronic records," Lewis Decl. ¶ 6, CREW notes that its request was not limited to electronic records but instead sought "records of any kind, including paper records, electronic records, audiotapes, videotapes, photographs, data, and graphical material." CREW's FOIA Request, ECF No. 16-2, Ex. A.[5] GSA responds that an electronic records search would capture *all* records, since the agency's "record retention policy" ostensibly requires paper records to be stored electronically. Lewis Decl. ¶ 9.[6]

---

[5] Though *one* of those five requests did request email communications specifically, the other four by their plain terms are not so limited.

[6] The declaration cites to a document with the subject "GSA Records Management Program," *available at*

8

The trouble for GSA is that CREW happened to read the "record retention policy" GSA alludes to, and it appears to stand for directly the opposite proposition: that records are kept in a variety of media. The policy notes, for instance, that "every GSA employee creates records in a variety of media" and contemplates that they will be kept in various formats, as when it warns employees that they "may never remove records, regardless of media, from GSA." As CREW puts it: "This policy on which GSA relies to justify its limited search not only does not, contrary to Mr. Lewis's representations, require all employees to store all paper records electronically, but it expressly recognizes and addresses the management of paper records in their original media." Pl's Opp. 20. Tellingly, neither the agency's reply nor its supplemental declaration bothers to address this point.

The Court therefore has no choice but to order GSA to conduct a fresh search of its non-electronic records. In doing so, the agency must search beyond OCIO; in addition to any other component entity likely to have responsive records, GSA must search the records of the GSA Public Buildings Service, the GSA Office of the Administrator, and the National Capital Region, as CREW expressly requested. CREW's FOIA Request, ECF No. 16-2, Ex. A. As the Court indicated at the hearing, agencies frequently conduct decentralized paper-record searches by identifying components and/or particular personnel that are reasonably likely to have responsive records and asking them to search their files and produce any resulting material.

---

https://www.gsa.gov/cdnstatic/OAS_P_1820.1_Records_Management_Directive_%28signed_3-7-2014%29.pdf.

3. *Search Terms*

CREW's third contention is that the agency's search terms were under-inclusive. Pl's Opp. at 21. GSA used the following keywords: "FBI"; "FBI Headquarters"; "FBI Headquarters procurement"; "Mary Gilbert and Tim Horne and eop.gov"; "Mary Gilbert and Tim Horne and fbi.gov"; "Mary Gilbert and Tim Horne and omb.gov"; and "procurement for the new FBI Headquarters consolidation."[7] Lewis Decl. ¶ 7. CREW says that these search terms came up short in two ways: first, the agency should have included "JEH" and "the Hoover Building" since they are "commonly used terms within the FBI and GSA for the FBI headquarters building"; and second, the agency should have expanded its search for communications beyond those sent to or from GSA employees Gibert and Horne. Pl's Opp. at 21. CREW is correct on both counts.

First, the headquarters-synonym argument. An agency's search must be "reasonably calculated to uncover all relevant documents." Ancient Coin Collectors Guild, 641 F.3d at 514 (quotation omitted). "Although a requester must reasonably describe the records sought, an agency also has a duty to construe a FOIA request liberally." Nation Magazine, Washington Bureau v. U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995) (alteration, citation, and quotation omitted). Part of liberally construing a request is searching for "synonyms" and "logical variations" of the words used in the request; an agency may not fish myopically for a "direct hit on the records" using only "the precise phrasing" of the request. Gov't Accountability Project v. U.S. Dep't of Homeland Sec., No. 1:17-CV-2518, 2018 WL 4954149, at *2 (D.D.C. Oct. 12, 2018) (Cooper, J.). Here, it strikes the Court as rather likely that "JEH" and "the Hoover Building"—referring to the current headquarters—would be used in communications and

---

[7] GSA later corrected "Mary Gilbert" to "Mary Gibert," which led to it producing additional responsive documents.

10

records regarding the headquarters consolidation project; a search reasonably calculated to uncover all documents responsive to CREW's request therefore ought to include these rather obvious synonyms. See id., 2018 WL 4954149, at *2. GSA's response is a non-starter. It contends these additional search terms would not yield more returns, citing the fact that those words "JEH" and "Hoover" do not appear often in the 28 pages of responsive documents. But this misses the point: perhaps the words "JEH" and "Hoover" were not used in records that also used the words "FBI headquarters," but they *may* have been used in other records—particularly informal records like emails—as a replacement or shorthand for "FBI headquarters."

Second, the email address issue. The agency reasonably searched specifically for the Gibert and Horne email addresses given that two of CREW's requests expressly sought their email communications. CREW's FOIA Request (requests two and three), ECF No. 16-2, Ex. A. But the agency erred by apparently applying the *expressio unius est exclusio alterius* canon of statutory construction—which holds that when one thing of a class is expressly mentioned, all others of the same class are excluded. Yes, CREW asked specifically for Gibert and Horne's communications with one another and with the White House, but its fourth and fifth requests seek communications between GSA officials generally and the FBI and the Office of Management and Budget ("OMB"). Yet the agency searched only for emails between Gibert and Horne, on the one hand, and fbi.gov and omb.gov addresses, on the other. A search more faithful to CREW's broad request would have searched instead for communications between .gsa and .fbi/.omb email addresses. The agency offers only a blanket rebuttal, asserting that it "used reasonable and appropriate search terms" and citing to a portion of the declaration that does not squarely engage with CREW's argument that GSA's search was inappropriately confined to Gibert and Horne's email addresses. See Def's Reply at 3 (citing 2d Lewis Decl. ¶ 6).

11

That is not all, CREW says. It looks at the fruits of the second search—the one that corrected "Gilbert" to "Gibert"—and asks why that search turned up responsive records that the first one did not. Even with the misspelling, several documents produced by the second search contained the terms "FBI" and "FBI Headquarters"—two terms GSA included in its initial search—and clearly concerned the cancellation of the consolidated headquarters project. See Pl's Opp. at 22 (citing, *inter alia*, a 13-page explanation for the cancellation and a question and answer sheet regarding the project). GSA did not provide those documents after its first search, yet it stands to reason that it should have if it had adequately searched for "FBI" and "FBI Headquarters," and if it had fully reviewed the search returns to determine whether they fit within CREW's request. CREW is right that this offers further reason to question the agency's search, even if it goes more to the agency's determination of what qualified as responsive, rather than the reasonableness of the search inputs themselves. And again, the agency fails to address CREW's critique. Nowhere in its reply or in the attached supplemental declaration does it explain this anomaly.

For all these reasons, the Court will deny without prejudice GSA's motion for summary judgment and will order the agency to conduct a supplemental search. The agency must (1) conduct a search of any non-electronic records that it determines are likely to contain responsive documents, and must expand that search to include the GSA component offices listed in CREW's first request; (2) add the keywords "JEH" and "Hoover building" to its electronic search terms; (3) expand its search for relevant communications between GSA personnel and the FBI and OMB, as described in CREW's fourth and fifth requests; and (4) provide the Court a supplemental declaration explaining how it determined whether potentially responsive records were in fact responsive.

C. Justification for Withholdings

CREW also questions the legitimacy of GSA's withholdings. GSA shielded several responsive documents from disclosure by claiming the deliberative-process privilege under FOIA Exemption 5. "To establish that a document is covered by the privilege, the government must show that it is both 'predecisional' and 'deliberative.'" Protect Democracy Project, Inc. v. U.S. Dep't of Def., 320 F. Supp. 3d 162, 176 (D.D.C. 2018) (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)). "A predecisional communication is one that 'occurred before any final agency decision on the relevant matter.'" Id. (quoting Nat'l Sec. Archive v. CIA, 752 F.3d 460, 463 (D.C. Cir. 2014)). "A deliberative communication is one that "reflects the give-and-take of the consultative process." Id. (quoting Coastal States, 617 F.2d at 866). Agencies provide explanations for their withholdings through a Vaughn index, "a system of itemizing and indexing that would correlate statements made in the [agency's] refusal justification with the actual portions of the document[.]" Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973).

CREW contends, and the Court agrees, that GSA's Vaughn index is patently inadequate. To start, the index divides withheld documents into two "batches," but fails to indicate which documents fall into which batch. See Vaughn Index, ECF No. 16-2, Ex. D at 1-2. The agency compounds this confusion by providing page numbers but failing to correlate those page numbers to any particular produced or withheld document. Id. Thus, quite apart from whether the agency's justifications for withholding documents are substantively adequate, the Vaughn index here fails even to "correlate statements made in the [agency's] refusal justification with the actual portions of the document[.]" Vaughn, 484 F.2d at 827.

13

But even if these easily correctable problems did not plague the Vaughn index, a more fundamental defect does: the description of the withheld documents is so vague as to make impossible any meaningful evaluation of the appropriateness of the deliberative-process privilege. In "Batch #1," the agency withheld "[d]raft documents of communications and talking points for GSA, OMB and FBI prior to the final determination and talking points being decided upon as the rationale for the decision to cancel the FBI Headquarters Consolidation Plan." Vaughn Index, ECF No. 16-2, Ex. D at 1. In "Batch #2," the agency withheld "[i]nformation compiled for purpose of the agency's deliberative process prior to the final determination to cancel the FBI Headquarters Consolidation Plan." Id. at 2.

Start with the easier point: the obvious inadequacy of the Batch #2 explanation. The agency makes no attempt to describe the withheld documents. It does not say who drafted them or for whom they were intended, nor does it say what type of information they contained. Instead, it states only that the withheld documents contain "[i]nformation compiled for purposes of the agency's deliberative process." Id. This is akin to a plaintiff attempting to plead a claim by reciting the legal elements but failing to provide any supporting facts. The Court need not look to the case law for useful analogs; the deficiency of the agency's explanation is plain on its face.

The Batch #1 explanation inches closer to acceptability but likewise stops short. It describes the withheld documents as "talking points," suggesting the agencies were discussing how best to communicate the cancellation decision to stakeholders and the public. Agencies often withhold "talking points" under the deliberative-process privilege, and "courts have generally found that documents created in anticipation of press inquiries are protected." Protect Democracy Project, 320 F. Supp. 3d at 177 (citing cases). Comparison to other cases, however,

reveals the inadequacy of GSA's talking-points explanation here. In American Center for Law & Justice v. U.S. Dep't of Justice, the court accepted the agency's talking-points claim, but that was because the agency made clear that the withheld documents were "drafted before and in preparation for communications with the press and public" and "reflect[ed] the drafters' opinions and analyses on specific topics and focus[ed] on how to best . . . respond to questions on these topics." No. 17-CV-01866, 2018 WL 4496306, at *5 (D.D.C. Sept. 19, 2018) (quoting agency explanation for withholding). Here, by contrast, the agency has not explained *why* the withheld documents constitute deliberative talking points.[8] Still more telling is this Court's conclusion in Protect Democracy Project: despite a far more detailed explanation than GSA offers here, the undersigned conducted an *in camera* review of the withheld talking-points documents to ensure they qualified as predecisional and deliberative. 320 F. Supp. 3d at 177. In light of these guideposts, the Court concludes that GSA's talking-points explanation is inadequate. The agency must either provide a more robust explanation or produce the documents in full.

CREW makes one final point. It contends that GSA wrongly redacted factual information—including the number of responses it received to its request for information regarding the swap-relocation proposal, the number of offerors GSA short-listed for the project, and the appraised value of the Hoover Building—from a document the agency produced to CREW. Pl's Opp. at 29-30 (citing Findings and Determination, ECF No. 17-1, Ex. E). CREW argues that the deliberative-process privilege does not apply to information like this, citing the general rule "that factual material must be disclosed but advisory material, containing opinions

---

[8] The Court recognizes that what was *sufficient* in American Center is not necessarily *required* in every other case. It nevertheless finds the difference between the explanations instructive.

and recommendations, may be withheld." Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 256 (D.C. Cir. 1977). GSA counters that the redacted factual information "reflects the Agency's deliberative process prior to reaching the decision to cancel the procurement" because it "was ultimately part of the agency's deliberations in deciding whether or not to cancel the procurement." 2d Lewis Decl. ¶ 10.

The Court, however, raised a separate question regarding the suitability of the deliberative-process privilege: did the document containing the redactions qualify as predecisional? Its title—"Findings and Determination"—and the date appearing on the document—the same day the procurement cancellation was announced—strongly suggested it was not. At a hearing convened by the Court to address this issue, government counsel indicated that GSA was preparing a supplemental declaration to address the Court's question. The Court therefore agreed to defer judgment on that issue until it reviewed the agency's declaration and CREW's response thereto.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that GSA's motion for summary judgment is denied. It is further

**ORDERED** that the agency conduct a new search and provide a more comprehensive justification for its withholdings. Specifically, the agency must (1) conduct a search of any non-electronic records that it determines are likely to contain responsive documents, and must expand that search to include the entities listed in CREW's first request; (2) add the keywords "JEH" and "Hoover building" to its search terms; (3) expand its search for communications between GSA personnel and the FBI and OMB; (4) provide a supplemental declaration explaining how it determined whether potentially responsive records were in fact responsive; and (5) provide a

16

more comprehensive Vaughn index explaining its withholdings, or else produce the withheld documents in full.

The Court will reserve judgment on the agency's redactions of the "Findings and Determinations" document pending review of GSA's supplemental declaration. GSA shall file the declaration by December 24, 2018, and CREW shall file any response by January 9, 2019.

**SO ORDERED.**

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: December 17, 2018